**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CARLONDA KEEWANA EXSON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 7331** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carlonda Keewana Exson seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff moved for summary judgment. After careful review of the record, the Court now affirms the Commissioner's decision.

## PROCEDURAL HISTORY

Plaintiff, at 36 years of age, applied for SSI benefits on January 26, 2009, three days after she had been released from prison, having served a sentence of over 17 years for a murder conviction. (R. 81, 193, 196). Her application stated that she is disabled due to "learning problems," and she alleged her disability began on the day she became incarcerated for that crime, on October 25, 1991, at age 18. (R. 193, 205-06). She further explained to the interviewer at the field office at the time she made her application that "I have been incarcerated from 1991 through the present. I have severe

learning problems and cannot do any type of job in the national economy now. I cannot do anything." (R. 206). In the most recent Disability Report, dated August 25, 2010, Plaintiff stated that since about January 1, 2010, she has problems standing for a long time; has outbursts when she feels uncomfortable; is diagnosed with diabetes; falls asleep while completing tasks due to sleep apnea; is obese; has stress incontinence; cannot concentrate on tasks or instructions and forgets things; has an eating disorder; breaks out in boils; has recurring skin infections; and has high cholesterol. (R. 236).

The Social Security Administration ("SSA") denied Plaintiff's application initially on April 8, 2009, and again upon reconsideration on May 19, 2010. (R. 81-82). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge James D. Wascher (the "ALJ") on May 11, 2012. (R. 13). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Michael L. Blankenship (the "VE"). After leaving the record open for additional evidence that Plaintiff failed to submit (or to request more time to submit), the ALJ issued his decision on August 13, 2012. (R. 13-29). He determined that Plaintiff is not disabled because she is capable of performing certain light jobs that exist in significant numbers in the national economy. (*Id.*). The Appeals Council denied review of the ALJ's decision, making the ALJ's determination the final decision of the Commissioner. (R. 1-5). Plaintiff now seeks judicial review.

In support of her motion, Plaintiff argues that the ALJ erred (a) in finding that her impairments did not meet or equal the requirements of Listing 12.04; (b) in misevaluating the opinion evidence from her mental health treatment providers and the opinions from two consultative examiners; (c) in over-emphasizing her activities of daily

living; (d) in discounting her credibility due to her treatment history; and (e) by failing to fully develop the record. As discussed below, the Court finds no merit to any of these arguments.

**FACTUAL BACKGROUND**

Plaintiff completed her GED and earned some credits towards a college degree while she was incarcerated. (R. 56, 210, 303). After leaving prison, she worked for about a month around the holidays doing bell ringing for the Salvation Army. (R. 57-58, 199). She engaged in no other post-imprisonment employment. Plaintiff first lived with her sister upon her release from prison, until her sister put her out. (R. 69, 196). She was living in a shelter called Matthew House at the time of the May 11, 2012 hearing. (R. 56-57).

**A.    Medical History**

**1.    1990s through January 2009**

Plaintiff's health records from her period of incarceration (October 1991 to January 2009) are mostly irrelevant to her disability claim, but a few bear mention. Regarding her mental health, on August 21, 1992, she complained of depression, presented with a flat affect, and stated she wanted to cut her wrists. (R. 559-70). She was admitted to Cermak Hospital for evaluation, was administered the anti-depressant Sinequan, and was diagnosed with a depressed mood. (R. 564). Plaintiff was released from Cermak on August 24, 1992 after she continuously displayed normal behavior. (R. 564-65). At discharge, she denied ever being suicidal. (R. 565).

A couple of months later, on October 1, 1992, Plaintiff was evaluated by Dr. Dale Hoke, a psychologist at the prison. (R. 302). Plaintiff reported a history of drug abuse,

including heroin and cocaine, as well as occasional alcohol use. Plaintiff told Dr. Hoke that she had received drug abuse treatment while she had been held in the Cook County Jail prior to her imprisonment, but no alcohol abuse treatment. (*Id.*). She also reported previous work in sales, fast food, and computer work, and was interested in a work assignment and schooling. (*Id.*). Dr. Hoke diagnosed Plaintiff with opioid and cocaine dependence. (*Id.*).

A few years later, on August 23, 1996, Plaintiff underwent another mental health evaluation by Dr. Cary Haywood, a psychiatrist. (R. 303-04). Plaintiff told Dr. Haywood that she had taken a substance abuse course in the summer of 1994, and that she had earned 12 to 15 credits so far towards her college degree. (*Id.*). The psychiatrist also noted Plaintiff had a history of fighting, anger, drug abuse, and some treatment with Sinequan, which had caused weight gain. (*Id.*). Plaintiff is 5'10" tall and weighed approximately 260 pounds at the time of this evaluation, making her about 100 pounds overweight by Dr. Haywood's estimate. (R. 304). The psychiatrist diagnosed Plaintiff with a history of chemical dependence and a current adjustment disorder with a depressed mood. (*Id.*). He recommended further substance abuse counseling and the anti-depressant Nortriptyline. (*Id.*). The record does not reflect whether Plaintiff took any Notriptyline, or underwent any substance abuse counseling.

Plaintiff's next mental health records are from October 2, 2000, when she was placed in segregation, but was observed to be in no unusual distress and did not require therapeutic services. (R. 305). On October 20, 2001, Plaintiff underwent anger management therapy, and on November 27, 2008, she underwent codependency group

therapy. (R. 306-08). Notes from both therapy sessions state that she was an active participant, appeared alert and oriented, and displayed an appropriate affect. (*Id.*).

Plaintiff's physical health records show that on January 8, 2001, she complained of foot calluses, and her feet showed "structural problems." (R. 350). Plaintiff underwent foot x-rays and was diagnosed with moderate hammer toe deformities and bunions in both feet, with a minimal heel spur on the right foot. (R. 349). Several years later, on October 6, 2007, Plaintiff complained of foot calluses and toenail fungus that made it hard to walk and painful to wear shoes. (R. 327). As a result, Plaintiff received monthly treatments at a foot clinic, where her calluses were scraped, toenails were clipped, and she was provided foot hygiene products. (R. 332, 334-41). This treatment continued until she was released from prison. (*Id.*). Plaintiff's records also show she was advised on a few occasions to exercise and watch her diet due to obesity. (R. 317, 592).

A January 15, 2009 health status report prepared in advance of Plaintiff's discharge noted her medical history was significant for obesity, drug abuse, psychological issues and psychological medication use, but stated she was taking no psychotropic medications or receiving other treatments at that time. (R. 288). Plaintiff was released from prison on January 23, 2009, and she applied for benefits three days later, on January 26, 2009. (R. 81, 196).

### 2.    March 2009 through December 2009

On March 9, 2009, Plaintiff underwent psychological testing by Dr. William N. Hilger, a clinical psychologist, for the purpose of evaluating her disability claim. (R. 378-83). She was casually dressed and appeared to be extremely obese, but had a normal

gait and posture.  (R. 378).  She reported no previous psychiatric treatment "in her life," no psychiatric hospitalizations, no serious health problems, and was not taking any medications.  (R. 379).  Plaintiff's sister brought her to the examination, and Plaintiff demanded that her sister be present during the examination.  (R. 378).  Despite Dr. Hilger's repeated admonishments, at times Plaintiff's sister answered questions for and coached Plaintiff.  (*Id.*).

Dr. Hilger found that Plaintiff put forth an extremely poor effort, was evasive, and acted inappropriately throughout his examination.  (R. 378).  When the psychologist approached Plaintiff in the waiting room, she began screaming, "Don't put me in jail, don't put me in jail!  What did I do wrong, what did I do wrong?"  (*Id.*).  She also laughed at herself in a childlike, immature, and exaggerated manner.  (*Id.*).  Plaintiff stated her full name and age, but then refused to answer questions about where she was living, the current date, or about why she had been in prison.  (R. 378-79).  When asked whether she was living in an apartment or a house with her sister, Plaintiff described the place as "a box."  (*Id.*).  When asked about cooking, she described the stove as "no touch, hot, no touch," and when asked about driving, she said "I like cars, rum-rum," as if she were a young child.  (*Id.*).  Plaintiff also said she plays with leaves outside, referred to the leaves as her friends, and tried to pull off her bra during the examination.  (R. 379-80).  On the other hand, she reported going to church and socializing there, shopping with her sister, bathing herself, and making sandwiches for herself.  (R. 379-81).  Her sister also admitted that prior to her imprisonment, Plaintiff had completed schooling through the 10th grade.  (R. 380).

Plaintiff initially admitted prior drug use consisting of "everything imaginable," but then denied she ever injected any drugs, drank alcohol or smoked. (R. 380). Despite Plaintiff's denials, Dr. Hilger detected an obvious odor of alcohol on her. (R. 379). Plaintiff also admitted to some drug abuse treatment in jail, but refused to elaborate. (R. 380).

Dr. Hilger reported that his testing of Plaintiff's knowledge, calculation ability, reasoning, and judgment produced invalid results due to her blatant malingering. (R. 381). For example, Plaintiff said that 2+2=5. (*Id.*). But Plaintiff's sister admitted that Plaintiff previously worked as a cashier at K-Mart, which Dr. Hilger found inconsistent with Plaintiff's alleged inability to do simple mathematics. (R. 381-82).

Overall, Dr. Hilger concluded that Plaintiff "has applied for disability benefits attempting to put on quite a show of serious emotional disturbance, but was not at all convincing." (R. 382). He diagnosed her with admitted past poly-substance abuse and probable ongoing alcohol abuse, and with extremely exaggerated symptomatology, blatant disingenuous effort, and malingering. (*Id.*). Dr. Hilger estimated Plaintiff had low-average intellectual functioning with fair mental potential, but no motivation to pursue work activities. (*Id.*). He also felt Plaintiff was capable of unskilled work activities such as in fast food preparation or housekeeping, if she was inclined, but she could not manage any benefit payments while abusing alcohol. (R. 383).

On April 7, 2009, state agency psychological consultant Dr. J.V. Rizzo, Ph.D, completed a psychiatric review for evaluating Plaintiff's disability claim, in which he determined her file presented no evidence she has a medically determinable mental

impairment. (R. 384-97). The next day, on April 8, 2009, the SSA denied Plaintiff's claim, and on April 15, 2009, she filed for reconsideration. (R. 81-82).

### 3. 2010

In early 2010, the SSA sought to arrange another mental health consultative examination of Plaintiff for use in reconsidering her disability claim. (R. 419). However, Plaintiff missed her appointment and did not respond to attempts to reach her. (*Id.*). Regarding her health care during this time, the record contains a March 31, 2010 prescription note for physical therapy, but no related treatment notes or any physical therapy records. (R. 516).

On May 17, 2010, state agency consulting psychologist Dr. Keith Burton, Ph.D., prepared a psychiatric review for reconsidering Plaintiff's disability claim. (R. 420-33). Noting that the only consultative examination in the file was over a year old, Dr. Burton determined there was insufficient evidence that Plaintiff had any impairment. (*Id.*). On May 19, 2010, the SSA again denied Plaintiff's claim. (R. 82).

A May 26, 2010 prescription note in the file shows Plaintiff was referred for a nocturnal polysonogram due to sleep apnea, but there are no related treatment notes or any records showing Plaintiff underwent this procedure. (R. 517). A few months later, on August 19, 2010, Plaintiff applied for an administrative hearing regarding her disability claim. (R. 92).

By September 2010, Plaintiff was again incarcerated for reasons which are not explained in the record. (R. 485). On September 16, 2010, she underwent a medical evaluation at the Dwight Correctional Center. (*Id.*). Plaintiff reported a history of treatment with anti-depressant medications, and the nurse evaluator noted Plaintiff

weighed 308 pounds, was tearful and anxious, and required a low bunk due to a slow walk. (*Id.*).

A couple of weeks later, on October 1, 2010, Plaintiff was admitted to the prison's infirmary, complaining of right shoulder pain after being handcuffed. (R. 489, 491). She was hysterical, tearful and uncooperative during the examination, but was later observed relaxing and moving her right arm and shoulder when the examiner left the room. (*Id.*). The next day, a nurse noted Plaintiff said she was hearing voices, and recommended she see the psychologist, but there are no notes concerning any psychiatric treatment at this time. (R. 495). Plaintiff was discharged from the infirmary a few days later, on October 6, 2010, when she reported feeling better. (R. 504).

The record contains a prescription note for Plaintiff dated November 4, 2010, ordering two weeks' worth of Depakote and Risperdal for bipolar disorder and schizophrenia, respectively, and Lisinopril for high blood pressure. (R. 516). There is also an undated portion of a prescription note for an unnamed patient (with Plaintiff's birth month and date), referring the patient for evaluation and treatment for agoraphobia, anxiety and schizophrenia. (R. 517). There are no related treatment or examination records in the file concerning these prescriptions and referrals.

On December 2, 2010, Plaintiff (who was apparently no longer incarcerated) visited the emergency room at the University of Chicago Medical Center. (R. 440-48). She complained of chronic, intermittent shoulder, back, and neck pain since an automobile accident about ten months ago. (R. 444). She had been taking Motrin with relief, but sought stronger pain medication because the pain was now preventing sleep. (*Id.*). Her examination showed she was alert and oriented, had no numbness,

weakness or tingling in the extremities, and was walking normally. (R. 444-45). However, she was visibly tired, had some muscle tenderness, and weighed 260 pounds, making her morbidly obese. (*Id.*). Her blood pressure was also high, but she admitted non-compliance with her blood pressure medication. (R. 444). Plaintiff was given some Vicodin and sent home with prescriptions for Norco and Flexeril for pain, but she left without her prescriptions. (R. 445, 459). The emergency room doctor also recommended physical therapy, but there is no evidence in the record that Plaintiff sought this treatment. (R. 461).

### 4. 2011

On March 15, 2011, Plaintiff again visited the emergency room at the University of Chicago Medical Center. (R. 434-39). She complained of various aches and pains, including a headache and left knee pain that made it difficult to walk, although she denied weakness or numbness. (R. 434). The attending physician noted she is a "drinker," as she admitted to daily drinking. (R. 434, 456). The staff had trouble treating Plaintiff because, despite her complaints, she left her room twice to go smoke, and refused to go back inside. (R. 434). When she did return, she was angry and had to be calmed down. (*Id.*). She was also observed to be "very well appearing" and was seen "joking around with her friend." (R. 457). Later that day, Plaintiff underwent a knee x-ray, which showed mild to moderate degenerative knee changes. (R. 449-52). The attending physician assessed Plaintiff with a probable cluster headache resulting from drinking, and knee pain that was likely arthritic. (R. 434). He prescribed Vicodin, and recommended a knee MRI and a follow-up with a clinic if Plaintiff's pain continued. (*Id.*). There is no evidence that Plaintiff underwent any knee MRI or other follow-up.

On July 7, 2011, Charles Thompson, a case manager at Matthew House, the shelter Plaintiff was then living at, submitted a letter to the SSA in support of Plaintiff's disability claim. (R. 520). The letter stated Plaintiff was experiencing bouts of depression which manifested itself as crying spells, but that her condition could be controlled with a regimented medication schedule. (*Id.*).

About a month later, on August 11, 2011, Plaintiff had a gynecological examination, and reported no psychiatric problems, including depression or anxiety. (R. 530-31). Plaintiff was also examined that day by a physician's assistant, Kelly Krawczyk, who noted in her psychiatric examination results that Plaintiff displayed an appropriate mood and affect. (R. 535). Regarding her physical symptoms, Plaintiff reported to P.A. Krawczyk a history of high blood pressure and diabetes which were both stable with medication. (R. 533). Plaintiff also complained of left knee pain of about a week, and displayed some decreased mobility, joint locking, and tenderness. (R. 533-34). P.A. Krawcyzk recommended a left knee x-ray, and the use of heat, an ACE bandage, rest, and elevation to relieve pain. (R. 535). Plaintiff's September 7, 2011 knee x-ray showed joint effusion, but no fracture, dislocation, bone erosion, or significant joint space narrowing. (R. 543).

At Plaintiff's September 8, 2011 follow-up with P.A. Krawcyzk, Plaintiff was agitated and anxious, and requested refills of Depakote and Risperdal. (R. 482, 525, 546-49). P.A. Krawczyk noted that Plaintiff's psychiatric history, including her medication treatment history, were unclear, so she provided refills but also referred Plaintiff to see a psychiatrist at Provident Hospital. (*Id.*). Plaintiff went to see the psychiatrist that same day, but he was not available, so she went to the emergency

room, where she again complained that she needed to see a psychiatrist. (R. 482). She was observed to be alert, oriented and in no acute distress, and was quickly discharged. (R. 481-83).

Plaintiff visited P.A. Krawcyzk again on September 12, 2011, complaining of painful foot calluses and a rash, and was recommended to see a podiatrist. (R. 522-23). There are no records showing Plaintiff had any podiatry consultation. (*Id.*). Plaintiff did report to P.A. Krawcyzk that she had made a psychiatry appointment to get mental health treatment in October. (*Id.*). She further reported having some difficulty functioning due to bipolar disorder, but also stated she was unsure what she had been diagnosed with while incarcerated. (R. 522). She was also unclear on whether she had ever been diagnosed with bipolar disorder or schizophrenia. (*Id.*).

Plaintiff had an administrative hearing scheduled for October 18, 2011. (R. 42-45). The day before this hearing, she went to the emergency room at Stroger Hospital, complaining of hallucinations and a headache. (R. 469-73). Plaintiff's records from this visit are sparse, but show she was released with instructions to go to her scheduled psychiatry appointment. (*Id.*). Plaintiff's attorney reported that Plaintiff was not released from Stroger in time to attend the hearing, so it was rescheduled. (*Id.*).

On October 25, 2011, Plaintiff visited a psychiatrist at the Provident Hospital, and stated that she had been referred due to bipolar disorder, had been periodically treated with Depakote and Risperdal, and was seeking disability benefits. (R. 484). She appeared agitated, and the psychiatrist recommended she consider a hospitalization to get her stable and on medications. (*Id.*). The psychiatrist also told Plaintiff he could help her with her disability forms. (*Id.*). Plaintiff became defensive and angry, and said

she did not want the psychiatrist to "lock her up." (*Id.*). She then walked out without any medications and refused a follow-up appointment. (*Id.*). The psychiatrist noted that Plaintiff left angry, but was coherent and not a danger to herself or others. (*Id.*).

A few days later, on November 3, 2011, Plaintiff followed-up with P.A. Krawczyk regarding her high blood pressure and mental health issues. (R. 527-29). Regarding her blood pressure, she reported reducing her alcohol and tobacco intake as recommended, but she had not been taking her medications, exercising or following her prescribed weight-loss diet. (*Id.*). She was given a medication refill and reminded to eat healthy and exercise. (R. 529). Regarding her mental health, Plaintiff appeared anxious, emotional and tearful, and used rapid speech. (*Id.*). She reported that the Provident Hospital psychiatrist she saw in October wanted to hold her against her will. (R. 527). She also admitted to leaving that evaluation without any medications. (*Id.*).

P.A. Krawcyzk noted that Plaintiff presented with anxious, fearful, compulsive, racing thoughts, difficulty concentrating, excessive worry, restlessness, increased energy, and was easily startled. (*Id.*). The P.A. assessed Plaintiff with an unspecified bipolar disorder which was aggravated by conflict, stress and lack of sleep, and unspecified schizophrenia. (R. 527, 529). The P.A. recommended Plaintiff establish regular psychiatric care, and since Plaintiff did not want to return to Provident, referred her instead to Community Mental Health Council ("CMHC"), and gave her medication refills. (R. 529). However, the record does not reflect that Plaintiff obtained treatment from CMHC at this time.

**5.    2012**

The record next contains several appointment slips for doctor's visits scheduled in March and mid-May 2012, but no related treatment notes or records.  (R. 516-19).  As discussed further below, Plaintiff testified at a hearing before the ALJ on May 11, 2012.  (R. 46).  Six days after the hearing, on May 17, 2012, Plaintiff's representative arranged for her to be evaluated by psychologist Dr. Michael E. Stone, Psy.D., a consultative examiner.  (R. 604-07).  Dr. Stone also reviewed Plaintiff's records provided by the Bureau of Disability Determination Services prior to the examination.  (R. 604).  Plaintiff used a cane at the examination, and was well-dressed and well-groomed.  (*Id*.).  Dr. Stone also found her minimally cooperative, with adequate eye contact, although she was tense, serious and irritable throughout the examination.  (R. 605).

Plaintiff discussed her history of incarceration with Dr. Stone (but said it was for selling drugs, not murder), as well as her emergency room visits, past drug abuse that she said was in remission, and lack of employment.  (R. 604).  She also reported being homeless and living periodically at a shelter.  (R. 604-05).  Plaintiff stated that the shelter staff did the shopping and cooking for her, as well as helped her with travel and money management.  (R. 604-05).

Dr. Stone observed that Plaintiff was alert, oriented, did not exhibit any manic symptoms, had no hallucinations and delusions, and did not appear suicidal.  (R. 605).  Her thought process was logical and sequential, she had no loose associations, flight of ideas, tangentiality or circumstantiality, and she had normal speech.  (R. 605-06).  However, her affect and thought content were positive for depression and agitation, she had some problems maintaining attention and concentration, and she expressed

14

feelings of hopelessness, helplessness, and anhedonia.[1]  (R. 605).  Her memory testing was mostly normal, but simple mathematical calculations were difficult for her, and she knew who the President is, but not the mayor.  (R. 606).  Although she could name similarities between shirts and hats, and apples and bananas, she could not name a similarity between a boat and an automobile.  (*Id.*).  She also knew that she should "run out" of a movie theater that smelled of smoke, but said that if she found a stamped, addressed envelope on the sidewalk she should "give it up."  (*Id.*)  She had difficulty grasping the meaning of proverbs.  (*Id.*).

Dr. Stone diagnosed Plaintiff with agitated depression, substance abuse in remission, hypertension, obesity and diabetes.  (R. 607).  The psychiatrist also opined that Plaintiff showed signs of concrete thinking, but also displayed some significant impairments.  (*Id.*).  Dr. Stone estimated her intelligence was "within the borderline range of intellectual functioning," and concluded that she would be unable to manage any benefits she received on her own.  (*Id.*).

**B.    Plaintiff's Testimony**

Plaintiff submitted a function report dated February 13, 2009 in support of her claim.  (R. 216-23).  She was living in a house with her sister at the time of this report.  (R. 216).  Plaintiff wrote that when she wakes up, she will "zone off into space" for an hour, and then it takes her three hours to get dressed because she cleans and "arrange[s] stuff" first.  (R. 216).  She spent her days walking around making sure things are closed and locked, watching television, and listening to music, the same as she did

---

[1]      "Anhedonia" means the "inability to experience pleasure in normally pleasurable acts."
http://medical-dictionary.thefreedictionary.com/anhedonia (all websites in this opinion were last visited March 2, 2015).

in prison.  (*Id.*).  She also reported making sandwiches and salads, taking out the garbage, going outside every day in the front yard, and going shopping periodically, although she moved slowly because of her weight.  (R. 218-19).  She wrote that she feels scared, has trouble concentrating and finishing tasks, and cries when she remembers being in prison.  (R. 217-21).  She indicated that she can walk a block before needing to rest for about ten minutes, and that she does not use and had not been prescribed any ambulatory device, such as a walker or cane.  (R. 221-22).

At the May 11, 2012 hearing before the ALJ, Plaintiff, who was represented by counsel, entered the room limping and using a cane, stated, "I don't want to go back to jail," and started to walk out of the hearing room until she was reassured by her counsel.  (R. 19).  She was periodically tearful, testified that she was in pain and not feeling well, and said that she cries "all the time."  (R. 49, 64-65).  She said she was living at Matthew House, a shelter, in a group-living situation, but that she did not like it because she likes to be by herself.  (R. 56-57).  She also said she does nothing all day but watch television or sit outside, and that the shelter staff makes her meals, does the chores and does her laundry.  (R. 62-64).  She did admit helping with the garbage, bathing herself, and dressing herself.  (*Id.*).

Plaintiff testified that she did temporary work as a bell ringer for the Salvation Army around the holidays, but that she stopped that work because of problems with her legs.  (R. 57).  The record reflects that Plaintiff reported self-employment earnings of over $10,000 in 2009, and the ALJ asked Plaintiff about these earnings.  (R. 58).  Plaintiff testified that she was not self-employed in 2009, but admitted she filed a tax return that someone else prepared for her, and received a refund for 2009.  (R. 69-70).

She said the money did not go to her, but was taken for rent and other expenses. (R. 70-71).

Regarding the pain in her legs, Plaintiff testified that her right foot is deformed and causes pain in her right leg when standing, sitting and walking, and that she has cramps and spasms in both legs. (R. 58-61). She said her right foot will occasionally give out, causing her to fall onto her left leg, and that her left knee hurts. (R. 59, 65-66). She used a cane during the hearing and testified that it was prescribed for her to help her keep her balance. (R. 66-67). There is no evidence of this prescription in the record. Plaintiff also testified that she suffers from low back pain and headaches, had not been eating, fidgets, does not sleep well, and has sleep apnea. (R. 59, 67). She takes Naprosyn for headaches and to relax and sleep, but it does not completely resolve her problems. (R. 60).

Plaintiff said she had not used drugs since 1991, or drank alcohol since she was released from prison, but also said she did not want to talk about these issues. (R. 61-62). Plaintiff also testified to having thoughts of hurting herself and not wanting to live in the past, but never acted and does not intend to act on those thoughts. (R. 67-68). When asked whether she hallucinates, she said she never hears voices, but does not like people telling her what to do. (R. 68).

## C. Vocational Expert's Testimony

Mr. Blankenship testified at the hearing as a VE. The ALJ asked him to consider a hypothetical person of Plaintiff's age, education and past work experience who can occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk and sit for up to 6 hours in an 8-hour workday; could not operate foot controls with the right foot; could

engage in no balancing, kneeling or crawling; and could occasionally climb, stoop and crouch. (R. 75). The person was also moderately limited in the ability to maintain concentration, persistence or pace; limited to performing simple, routine, repetitive tasks; should have few workplace changes and no fast-paced requirements; no interaction with the general public; and brief, superficial interaction with co-workers and supervisors. (R. 74). The VE testified that such a person could perform certain light work, including as a silver wrapper (10,090 jobs regionally), housekeeper (20,570 jobs regionally), and packing line worker (33,830 jobs regionally).

## D.    Administrative Law Judge's Decision

Despite the fact that Plaintiff reported earnings in 2009 that exceeded the threshold for substantial gainful activity, the ALJ credited her testimony that she was not actually self-employed, and determined she had not engaged in substantial gainful activity since her January 26, 2009 application date.[2] (R. 15). The ALJ then found that Plaintiff's affective disorder (sometimes characterized as an adjustment disorder with a depressed mood), degenerative joint disease in the knees, obesity, opioid dependence, cocaine dependence, and alcohol dependence are severe impairments, and her hypertension and diabetes are not severe impairments. (R. 15-16). He further determined that Plaintiff has no impairment or combination of impairments that meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16-18).

---

[2]    The ALJ used Plaintiff's application date rather than her alleged disability date in determining her eligibility for SSI because SSI is not payable prior to the month following the month in which her application was filed. (R. 13) (citing 20 C.F.R. 416.335).

After reviewing the record in detail, the ALJ determined that Plaintiff has the capacity to perform light work, but can never operate foot controls with the right foot; never balance, kneel or crawl; and can only occasionally climb ladders, ropes, scaffolds, stairs, or ramps, stoop or crouch. (R. 18). She is further moderately limited in the ability to maintain concentration, persistence or pace; is limited to performing simple, routine, repetitive tasks; must perform in a work environment free of fast-paced production requirements; can make only simple, work-related decisions with few, if any, work-place changes; can have no interaction with the general public; and can have only brief, superficial interactions with co-workers and supervisors. (*Id.*).

In reaching this conclusion, the ALJ gave some weight to the opinions of Drs. Burton and Rizzo, and greater weight to the opinions of Drs. Hilger and Stone. (R. 27). The ALJ also found Plaintiff less than fully credible for a variety of reasons, including inconsistencies in her testimony; findings by Dr. Hilger and other physicians that she appeared to be exaggerating her symptoms; her inconsistent statements about her drug and alcohol abuse; the infrequent and conservative treatment she received; the lack of support for her allegations in the objective medical evidence; her poor work history and incarcerations, suggesting reasons for non-employment other than disability; and her false tax return. (R. 19-21). Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of light jobs available in the national economy, and thus concluded she is not disabled. (R. 28-29).

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g).  In reviewing this decision, the Court will not "reweigh the evidence or substitute our judgment for that of the ALJ." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (citing *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)).  Instead, the Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).  An ALJ must also "build a logical bridge from the evidence to his conclusion."  *Id.* (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)).  A decision that "lacks adequate discussion of the issues will be remanded."  *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

**B.    Analysis**

**1.    Listing 12.04**

Plaintiff first argues that her impairments meet or equal the requirements of Listing 12.04, and that the ALJ's finding to the contrary is not supported by substantial evidence.  (Pl.'s Mem. in Supp., Docs. 12 and 12-1, at 7-9).  The listings identify and describe impairments that the SSA considers severe enough to prevent an individual from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). The claimant bears "the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990);

*Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006)).  Listing 12.04 relates to persons with affective disorders that are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," which results in certain significant functional limitations.  20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 12.04.

Plaintiff argues she is sufficiently limited to meet the requirements of Listing 12.04 because her affective disorder results in marked restrictions or difficulties in her activities of daily living, social functioning, ability to maintain concentration, persistence, or pace, and in repeated episodes of decompensation of extended duration.  (Pl.'s Mem. in Supp. 7-8).  Plaintiff's disorder must result in some combination of at least two of those limitations to meet the Listing 12.04(B) criteria, and she must satisfy additional criteria for the other listing requirements.  20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 12.04(A)-(B).

Here, the ALJ found Plaintiff did not meet the criteria of Listing 12.04(B) because her disorder resulted in only moderate limitations, and no episodes of decompensation of extended duration.  (R. 17).  He based this determination on a careful and accurate analysis of Plaintiff's medical records and testimony, her history of legal and substance abuse problems, and the findings of Drs. Hilger and Stone.  (*Id.*).  Plaintiff argues that the ALJ's determination is "simply wrong," but cites no medical opinions stating that she has marked limitations, nothing showing any episodes of decompensation, and no other evidence that the ALJ ignored.  (Pl.'s Mem. in Supp. 8).  Instead, Plaintiff relies on findings which the ALJ properly considered and evaluated, and which do not undermine his conclusions.

Plaintiff argues that the November 3, 2011 examination notes from P.A. Krawcyzk discussing her anxious, fearful, compulsive, and racing thoughts, difficulty concentrating and other issues show she is disabled. However, those notes do not discuss the intensity or duration of her symptoms. Rather, as the ALJ's opinion reflects, P.A. Krawcyzk assessed Plaintiff with "unspecified" conditions, recommended she establish regular mental health care, and attempted to refer her for further psychiatric evaluation. (R. 24). Plaintiff also cites Dr. Stone's May 17, 2012 examination findings that she had depressed and agitated thoughts, and problems with concentration and attention, to support her contention that her limitations are marked and disabling. However, the ALJ acknowledged these findings and contrasted them with Dr. Stone's other findings that Plaintiff was alert and oriented, did well on her memory testing, and showed a logical, sequential thought process, in concluding that the evidence as a whole showed her limitations were moderate. (R. 17, 22-23). Plaintiff has not shown any error in the ALJ's analysis here.[3]

In the alternative, Plaintiff argues that her physical impairments in combination with her mental impairments meet Listing 12.04's requirements because she uses a cane, has degenerative knee changes, and is obese. (Pl.'s Mem. in Supp. 8). The ALJ considered the evidence of these issues, but determined the record shows Plaintiff's knee impairments are relatively mild and she can ambulate well. (R. 16-17). The ALJ

---

[3] Plaintiff also argues that the ALJ erroneously relied on the notes from her March 15, 2011 emergency room visit stating she was smoking and joking with a friend to conclude she was only moderately restricted in social functioning, making an improper independent medical finding. (Pl.'s Mem. in Supp. 12). Plaintiff's assertion is incorrect; the ALJ referred to these portions of the emergency room visit notes in evaluating her credibility, but did not indicate that he found her smoking or joking with a friend supportive of her ability to maintain social functioning. (R. 20).

further found there is no evidence Plaintiff was prescribed any cane, or that her obesity elevates her symptoms to the level that meets a listing. (*Id.*). The ALJ's analysis is supported by the record; in contrast, Plaintiff cites nothing to show that her physical ailments impact her affective disorder to cause greater limitations than the ALJ found. In sum, the ALJ's determination that Plaintiff does not satisfy the requirements of Listing 12.04(B) is supported by substantial evidence, and she has not shown the ALJ erred in finding she does not meet that listing's full requirements.

### 2. Opinion Evidence

Plaintiff next argues that the ALJ erred in assessing the opinions of the mental health professionals who treated her, and in evaluating the opinions of Dr. Stone and Dr. Hilger. (Pl.'s Mem. in Supp. 9-13; Pl.'s Reply Mem., Doc. 17, at 1-4). The Court will evaluate each of these arguments in turn.

### a. Mental Health Care Providers

Plaintiff first argues that the doctors at Cermak diagnosed her with bipolar disorder and schizophrenia with disabling symptoms, but the ALJ ignored these treating source's opinions instead of properly according them controlling weight or "special deference." (Pl.'s Mem. in Supp. 12-13). This argument is both factually and legally incorrect.

"Treating source means [a claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. A treating source's opinion is entitled to controlling weight if it is "well supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (quoting 20 C.F.R. 404.1527(d)(2)). As Defendant correctly notes, however, the doctors at Cermak only treated Plaintiff over a four-day period. (Def.'s Resp., Doc. 16, at 3). Therefore, none of those doctors is a treating source as defined in the regulations, and the ALJ was not required to give any of their opinions controlling weight. *See Dornseif v. Astrue*, 499 F. App'x 598, 600 (7th Cir. 2013) (ALJ did not err in declining to accord controlling weight to opinion of doctor who treated patient over a nine-day period).

Furthermore, as the Defendant accurately points out, none of the doctors at Cermak diagnosed Plaintiff with bipolar disorder or schizophrenia, or rendered any opinion that she had disabling symptoms. (Def.'s Resp. 3-4, n.1). They merely diagnosed her with a depressed mood. Although the ALJ did not specifically discuss this opinion, he acknowledged that Plaintiff was diagnosed by other examiners as having a depressed mood or depression. While an ALJ must consider evidence contrary to his ruling, he need not provide "a complete written evaluation of every piece of evidence" in the record. *Murphy v. Colvin*, 759 F.3d 811, 817-18 (7th Cir. 2014) (quoting *McKinzey*, 641 F.3d at 891)). The ALJ did not err in failing to specifically discuss the Cermak doctors' notes when he otherwise considered their content, which was relatively minimal.

Plaintiff also provides no support for her assertion that the ALJ ignored the opinions of other mental health professionals who treated Plaintiff. She contends that the ALJ's statement that "the record still does not show that the claimant has established mental health treatment" demonstrates he ignored evidence that her

providers had diagnosed her with psychiatric conditions, prescribed medications, and referred her for treatments. (Pl.'s Mem. in Supp. 11; Pl.'s Reply Mem. 2). But Plaintiff takes the ALJ's statement out of context, misconstruing his analysis and determination.

In his thorough summary of the record, the ALJ acknowledged the differing mental health diagnoses Plaintiff received, her evaluation results, treatments with psychotropic medications and group therapy, and referrals for other treatments and evaluations. (R. 17, 20-24). Nevertheless, he concluded that the record showed very limited evidence of treatment, which was infrequent, routine and conservative in nature, and that despite a few referrals, "the record still does not show that the claimant has established mental health treatment." (R. 20). "[N]onetheless," the ALJ "included limitations to her mental residual functional capacity to give her every benefit of the doubt." (R. 21). The ALJ's statements do not show that he ignored any evidence; rather, he found that the evidence of Plaintiff's mental health issues and treatment was limited. That finding is supported by the record.

Plaintiff asserts that there is an "abundance" of mental health treatment notes which undermine the ALJ's "conclusory" analysis here, but the evidence she cites does not support her assertion. (Pl.'s Mem. in Supp. 11; Pl.'s Reply Mem. 4). She relies on notes from one-off visitations, such as the October 18, 2011 Stroger Hospital emergency room records, and the October 25, 2011 Provident Hospital evaluation, which the ALJ considered and accurately found were minimal evidence of evaluation and treatment. (R. 24). Plaintiff also cites the July 7, 2011 letter from her case manager, Charles Thompson, but as the ALJ noted, that letter only discussed Thomson's opinion that Plaintiff required medication to control her "bouts" of depression

and crying. (R. 23). The letter did not discuss any treatment Plaintiff had been (or was) receiving. Finally, Plaintiff relies generally on P.A. Krawcyzk's notes, but as the ALJ discussed, these notes show little more than the physician assistant's uncertainty about Plaintiff's psychiatric condition, some medication refills, and a few attempts to refer her for psychiatric care from specialists. (R. 24). The ALJ's finding that Plaintiff failed to establish consistent, regular mental health care from any treating physicians is supported by the lack of evidence of such care in the record. Thus, Plaintiff has failed to demonstrate that the ALJ improperly evaluated or ignored any treating source's opinions or treatment notes.

### b. Dr. Stone's May 17, 2012 Examination Report

Plaintiff also argues that the ALJ erred in assessing Dr. Stone's May 17, 2012 evaluation report by "disregarding Stone's limitations" (she does not specify which ones) and also failing to describe what weight was given to the opinion. (Pl.'s Mem. in Supp. 9, 13; Pl.'s Reply Mem. 1-2). "[A]n ALJ must address certain factors in evaluating medical opinions—including the frequency and nature of any examinations or treatment, whether the opinion is supported by tests or the record, and the doctor's expertise." *Sawyer v. Colvin*, 512 F. App'x 603, 609 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)). The ALJ's decision shows he did not disregard Dr. Stone's opinion, but instead properly evaluated the opinion according to the factors in the regulations.

The ALJ discussed Dr. Stone's report in extensive detail, including the findings that Plaintiff had a depressed, agitated mood, and had deficiencies: in maintaining attention and concentration; doing simple calculations; in her fund of knowledge; in comparing and contrasting objects; and in judgment. (R. 22-23). He contrasted these

findings with Dr. Stone's other observations, including that Plaintiff was alert and oriented, had a logical and sequential thought process, was free of loose associations, flight of ideas, tangentiality, or circumstantiality, and had successful memory testing results. (*Id.*). The ALJ specifically relied on Dr. Stone's opinion in his listing analysis, as discussed above, and in making his residual functional capacity determination. (R. 17, 27). In doing so, the ALJ evaluated issues concerning the reliability of the psychologist's report, including, for example, that Dr. Stone is a psychologist and was the consultant who most recently examined Plaintiff, that he found Plaintiff was "minimally cooperative" during the examination, and that she reported some inconsistent facts to him, such as that she was incarcerated for selling drugs rather than for murder. (R. 17, 21-23, 27).

In weighing the opinion evidence, the ALJ noted that he gave great weight to Dr. Hilger's opinion in part because it was consistent with Dr. Stone's opinion, implying that Dr. Stone's opinion was also given significant weight. (R. 27). Also, as the Commissioner points out, the ALJ noted that he gave less weight to the opinions of Dr. Burton and Dr. Rizzo because their opinions "pre-dated and did not consider Dr. Stone's report and opinion." (Def.'s Resp. 4) (citing R. 27). This shows that Dr. Stone's opinion was given greater weight than these other consultant's opinions.

Plaintiff argues that the ALJ's explanation here is insufficient because he did not state the exact weight given to Dr. Stone's opinion, but an ALJ is not required to "state precisely how much weight" he gives a medical opinion. *Manley v. Barnhart*, 154 F. App'x 532, 536-37 (7th Cir. 2005) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004)). Rather, the ALJ must evaluate the opinion according to the regulatory

factors, support his determination with substantial evidence, and provide a "logical bridge" between the evidence and his conclusions—standards which are met here.

### c. Dr. Hilger's March 9, 2009 Examination Report

Plaintiff next asserts that the ALJ erred because he relied on "evidence from an invalid consultative examination" in granting great weight to Dr. Hilger's March 9, 2009 examination report, and some weight to the findings of Drs. Rizzo and Burton, to the extent their opinions resulted from Dr. Hilger's report. (Pl.'s Mem. in Supp. 13-15; Pl.'s Reply Mem. 4). Although ALJs "are not bound by any findings made by State agency medical or psychological consultants," those consultants are "highly qualified" and are also "experts in Social Security disability evaluation," so an ALJ "must consider" their findings as "opinion evidence." 20 C.F.R. § 404.1527(e)(2)(i). Thus, an ALJ must evaluate a state agency consultant's findings using the same regulatory factors for evaluating other medical opinions—by considering the consultant's expertise, the supporting evidence in the record, the explanation for the opinion, and any other relevant factors. 20 C.F.R. § 404.1527(e)(2)(ii).

The ALJ carefully detailed Dr. Hilger's examination findings in his decision and explained the weight he gave the psychologist's opinion according to the regulatory factors. (R. 21-22, 27). His reasons for giving great weight to Dr. Hilger's opinion include that it is consistent with Plaintiff's treatment history, the medical evidence, the subsequent report by Dr. Stone, and because Dr. Hilger is a psychologist who examined Plaintiff and possesses "familiar[ity] with the Agency's regulatory program." (R. 27). The ALJ also explained that Dr. Rizzo found insufficient evidence Plaintiff has a medically determinable impairment, based in part on Dr. Hilger's finding that she

showed "extremely exaggerated symptomatology with blatant disingenuous effort and malingering" during his examination. (*Id.*). Dr. Burton concurred that Plaintiff's claim should be denied for insufficient evidence. (*Id.*). However, although the ALJ gave Dr. Rizzo's and Dr. Burton's opinions some weight, he found that Dr. Stone's examination and other evidence provided sufficient support that Plaintiff in fact suffers from medically determinable impairments. (*Id.*). These include an affective disorder and various substance-dependency issues, in addition to other impairments. (R. 15-16).

Against the ALJ's logical analysis, Plaintiff argues he erred in crediting Dr. Hilger's report because it resulted from a "self admitted [sic] invalid examination." (Pl.'s Mem. in Supp. 15; *see also* Reply 4). This oversimplifies both Dr. Hilger's findings and the ALJ's analysis of those findings. As the ALJ makes clear, Dr. Hilger reported that Plaintiff's poor testing results—such as her inability to correctly add 2+2—were invalid "in light of her 'blatant malingering.'" (R. 22) (quoting R. 379). Dr. Hilger supported this finding using evidence that the ALJ assessed, including, for example, the inconsistency between Plaintiff's stated inability to add 2+2 and her previous work as a cashier, and her poor effort, lack of cooperation, evasiveness, and other responses during the examination. (R. 21-22). The ALJ also noted that Plaintiff reported past work in sales, fast food, and computer work, and that she earned credits towards a college degree, which "accomplishments are inconsistent with her more limited presentation at the two consultative examinations." (R. 21).

Dr. Hilger found Plaintiff exhibited symptoms of "low average intellectual functioning" and other limitations, but not to the extent she alleges. (R. 22). An ALJ is entitled to rely on a physician's findings that a claimant "was exaggerating her

symptoms" and that her "claimed symptoms were contradicted by his clinical evaluation." *McKinzey*, 641 F.3d at 891. There is no error in the ALJ giving great weight to Dr. Hilger's opinion and thus declining to find her as intellectually limited as she attempted to portray herself. Nor did the ALJ err in giving some weight to the other state agency consultant's opinions to the extent they credited Dr. Hilger's opinion.

### 3. Activities of Daily Living

Plaintiff also argues that the ALJ "played doctor" by equating her ability to shower, dress and groom herself with an ability to work. (Pl.'s Mem. in Supp. 11). "[I]t is proper for the Social Security Administration to consider a claimant's daily activities in judging disability," but the Seventh Circuit has "urged caution in equating these activities with the challenges of daily employment in a competitive environment." *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) (citing *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

Fortunately, here the ALJ did not run afoul of the Seventh Circuit law, because the ALJ did not indicate Plaintiff's personal grooming was "commensurate with an ability to work," but merely considered this evidence along with other evidence in assessing her credibility, "as the regulations and rulings require." *Archer v. Astrue*, No. 09 C 4705, 2011 WL 720193, at *11 (N.D. Ill. Feb. 22, 2011) (citing *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)). Specifically, the ALJ contrasted Plaintiff's statement with her testimony that she does nothing but watch television most of the day as part of the evidence that supported finding her less than fully credible. (R. 19-20).

This finding of an inconsistency undermining Plaintiff's credibility was just one of several the ALJ relied on. Other examples include Plaintiff's statement to Dr. Hilger that she did not drink alcohol when he found she smelled of alcohol. (R. 20). The ALJ also noted an inconsistency between Plaintiff's hysterical complaints of shoulder pain to a prison doctor in October 1, 2010, and the staff's observations that she was relaxed and moving her shoulder when the examiner left the room. (*Id.*). These are just a few examples of several findings the ALJ used to support his determination, each of which is supported by the record. The ALJ's consideration of Plaintiff's showering, dressing and grooming activities as a small part of the total evidence concerning her credibility was not an error. *See Archer*, 2011 WL 720193, at *11 (ALJ's finding that claimant's travel was inconsistent with her testimony that she does nothing is not the same as equating travel with an ability to work).

### 4. Treatment History

As another part of his credibility determination, the ALJ found that Plaintiff's limited evidence of psychiatric treatment and lack of ongoing mental health care undermines her allegations of disabling mental health conditions. (R. 17, 20-21). Plaintiff acknowledges that an ALJ may draw a negative credibility inference from a failure to seek treatment, but argues that the ALJ erred in doing so here without exploring the reasons for her failure. (Pl.'s Mem. in Supp. 14; Pl.'s Reply Mem. 4-5). Plaintiff does not provide any explanation, however, for why she failed to establish regular psychiatric care, nor cite to any support in the record discussing any reasons she did not obtain care or treatment. She instead argues that "[h]ere, there actually was treatment that the ALJ just ignored." (Pl.'s Mem. in Supp. 14). As discussed above, this

Court does not find that the ALJ ignored any evidence of Plaintiff's mental health care or treatment, but instead he accurately found that the record showed the treatment she received was infrequent and limited.

The reasons "why a claimant failed to undergo treatment is one factor to consider when assessing an impairment, but the burden was on [Plaintiff] to explain why she was disabled as a result of her depression" and other ailments. *Pepper*, 712 F.3d at 367 (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004); *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987)). Plaintiff fails to carry that burden here where she provides no basis for undermining the ALJ's findings regarding her lack of mental health care. And even had the ALJ's failure to explore Plaintiff's reasons for failing to seek treatment "amount[ed] to error, it does not undercut the ALJ's other valid reasons for discounting [Plaintiff's] testimony," including her various inconsistencies, the findings of consultative examiners and other medical staff that she was exaggerating her symptoms, the objective medical evidence, her conservative, routine treatment, and her work, incarceration, and income tax history. *Hoyt v. Colvin*, 553 F. App'x 625, 628 (7th Cir. 2014).

### 5. Development of the Record

Lastly, Plaintiff argues the ALJ failed to fully and fairly develop the record in her case, requiring reversal. (Pl.'s Mem. in Supp. 14-16; Pl.'s Reply Mem. 4). She does not explain what evidence was missing or necessary for the ALJ to make a disability determination in this case. She merely asserts that the ALJ failed to assess the entire existing record, failed to obtain "proper medical reports," and should have contacted the physicians in the record to obtain further information about Plaintiff's impairments and

limitations. (Pl.'s Mem. in Supp. 15-16). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(e)). As repeatedly stated and explained above, the ALJ did not ignore any evidence that Plaintiff claims was overlooked, and the evidence here was adequate for the ALJ to determine Plaintiff is not disabled.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 12) is denied. The clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: March 2, 2015

SHEILA FINNEGAN
United States Magistrate Judge